1   **WO**

2

3

4

5

6                           IN THE UNITED STATES DISTRICT COURT

7                              FOR THE DISTRICT OF ARIZONA

8

9   United States of America,               )   CV 12-08237-PCT-DGC (MHB)
                                             )   CR 06-626-PCT-DGC
10                 Plaintiff,                 )
                                             )   **SUPPLEMENTAL REPORT**
11        v.                                  )
                                             )   **AND RECOMMENDATION**
12   Kenderick Begay,                         )
                                             )
13                 Defendant/Movant.          )
    _____         )

14

15   TO THE HONORABLE DAVID G. CAMPBELL, UNITED STATES DISTRICT JUDGE:

16           On November 28, 2012, Movant Kenderick Begay, who is confined in the United

17   States Penitentiary in Pollock, Louisiana, filed a Motion Under 28 U.S.C. § 2255 to Vacate,

18   Set Aside, or Correct Sentence by a Person in Federal Custody (hereinafter "§2255 motion"),

19   a Memorandum in Support of the Motion, and a Motion to Appoint Counsel.[1] (CV12-8237

20   ("CV") Docs. 1-3; CR 06-00626 ("CR") Docs. 111-113.) Plaintiff United States of America

21   (the "Government") filed its Response on March 15, 2013, and Movant filed his reply on

22   April 17, 2013.  (CVDocs. 6, 7.)   On August 16, 2013, this Court filed a Report and

23   Recommendation recommending that Movant's §2255 motion be denied.  (CVDoc. 8.)

24   Movant thereafter filed Objections to this Court's findings and recommendations as to three

25   of his eleven claims. (CVDoc. 11.)

26

27   _____

28           [1]The motions and memorandum were all filed by attorney Dan Drake, on Movant's
    behalf.  On January 22, 2013, the Court appointed Mr. Drake to represent Movant. (CV Doc.
    5.)

1    After filing his Objections, Movant moved for, and on November 5, 2013, presiding

2    District Court Judge Campbell granted an expansion of the record to include evidence of

3    pawn transactions, and referred the case to undersigned "for consideration of the expanded

4    record." (CVDoc. 15.)  Judge Campbell found that two documents submitted in support of

5    the motion to expand were "relevant to the consideration of Movant's ineffective assistance

6    of counsel claims." (Id., at 3.)  Those documents consisted of (1) an FBI agent report

7    documenting a 2002 interview of Movant, during which he provided the agent several pawn

8    shop tickets relating to the pawning of firearms, and (2) a T&R Market pawn shop ticket

9    indicating Movant pawned a Norinco SKS rifle on January 5, 2002.  (CVDocs. 12-1, 12-2.)

10    Movant filed several discovery motions between November 14, 2013 and January 30,

11    2014.  (CVDocs. 16, 22, 27.)  Movant also moved for, and was granted a deposition of

12    Movant's trial counsel.  (CVDocs. 35, 39, 41.)  On July 8, 2014, Movant filed a Supplement

13    to Claim and Motion to Amend and Supplement, in which he supplements claims one and

14    nine in his §2255 motion that (1) trial counsel rendered ineffective assistance by failing to

15    investigate an alternative shooter (Alfred Bennie Lee Jr.) theory of defense, and (2) trial

16    counsel rendered ineffective assistance by failing to investigate and present evidence that

17    Movant did not have access to the weapon used in the murder (pawn shop evidence).

18    (CVDoc. 65.)  On August 4, 2014, the Government filed its Response to Movant's

19    Supplement.  (CVDoc. 67.)  This Court ordered that no reply be filed without an order from

20    the Court, and no order was issued.  (CVDoc. 63.)

21                        **BACKGROUND[2]**

22    A. Statement of Facts - Trial.[3]

23

24    [2]This Court repeats the background from the original Report and Recommendation

25    for the convenience of the reader.

26    [3]The statement of facts are derived from the 9th Circuit *en banc* Opinion, affirming

27    Movant's conviction on appeal, unless otherwise noted. See, United States v. Begay, 673

28    F.3d 1038 (9th Cir. 2011), cert. denied, 132 S. Ct. 754, 181 L. Ed. 2d 508 (2011). (CRDoc.

      110.)

1     In the early morning hours of March 28, 2002, Movant left a party in Greasewood,

2 Arizona driving his truck, with passengers Loren Clark, Jessica Lee, Emmanley Begay (no

3 relation to Movant), and Movant's sister Mecheryl Begay.   Only Loren Clark and Jessica

4 Lee testified in Movant's trial (hereinafter "Lee" and "Clark").   According to Clark, around

5 2:00 a.m., Movant drove passed the victims, J.T.[4] and O.C., driving in the opposite

6 direction.   Movant flashed his truck lights at their vehicle, and both vehicles pulled off of

7 the highway and parked on a dirt side road.   Movant got out of his truck and stood for a

8 minute by the driver-side door of J.T. and O.C.'s vehicle.   He then walked back to his

9 truck, retrieved a rifle[5], walked back to the passenger side of the victim's vehicle and fired

10 eight or nine shots into the vehicle.   Movant walked back to his vehicle and placed the gun

11 under the back seat.   As Movant walked back to his truck, Mecheryl  began screaming and

12 making horrible cries, asking him "What did you do?" or "Why did you do that?"   Movant

13 told his sister to be quiet.   Clark was outside Movant's vehicle, having exited to relieve

14 himself, and asked Movant why he had shot the victims.[6]   Movant did not respond.

15 Movant, Clark and Mecheryl drove away, leaving Lee behind.   Prior to the shooting, Lee

16 was in the rear of Movant's truck in a comatose state having consumed too much alcohol.

17 The gunshots aroused her, at which point she exited the vehicle to vomit.[7]   As she walked

18 away from the scene, Lee observed O.C. attempting to hold J.T. upright and that J.T. had

19 blood on his shirt.

---

[4]Because the victims were minors, they are referred to using only their initials.  See 18 U.S.C. § 3509(d).

[5]Testimony at trial indicated that the bullets recovered from the scene were .30 caliber and could have been fired from many different types of rifles.  (CRDoc. 91, at 75, 88, 113.)

[6]The transcript of the trial reflects that Clark testified that he asked Movant "what the hell are you doing," not why he "shot the victims."  (CRDoc. 91, at 141.)

[7]She did not observe the shootings, but heard the gunshots, and heard Mecheryl screaming and crying.

1   O.C. drove to the home of Clark's mother to seek help.  By that time, J.T. was
2   already dead.  O.C. was thereafter transported to a local hospital before being transferred
3   to a hospital in New Mexico.  O.C. died from her wounds three days later.

4       The  FBI and Navajo investigators began investigating the murders but initially
5   failed to make any significant progress.  Witnesses interviewed denied being out on the
6   night of the homicides[8], and Movant told investigators that he was with his girlfriend the
7   entire night.  Investigators located the crime scene two weeks after the homicides and
8   located glass and six .30 caliber shell casings on the ground.

9       Six months later, in the Fall of 2002, Lee contacted the FBI and told them (over the
10  course of several months - see fn 8), and later testified at trial, that she had been at a party
11  that night with Movant, Mecheryl Begay, Clark, and Emmanley Begay.  She admitted to
12  drinking and that her memory had been impaired, but that she did remember leaving the
13  party with the group.  Lee stated she had passed out in the vehicle, but awoke upon hearing
14  gunshots.  She saw the victims after they had been shot.  Lee testified that a few days after
15  the murders she asked Movant what she should tell the police about the murders, and
16  Movant told her to blame it on two other men.  Lee and Movant never spoke again.

17
18
_____

19       [8]In fact, both Clark and Lee, when initially contacted denied knowledge of the events.
20  Clark stated to the FBI on March 29, 2002, that Movant had pawned all of his guns, and
21  stated in an April 8, 2002, interview that he ran into Movant after the homicides and had a
    "sickening feeling that Movant was involved."  (CRDoc, 93, at 15-20.)  Clark did not admit
22  the facts he testified to at trial until May, 2006.  (Id., at 21.)  Movant was not indicted until
    June 27, 2006. (CRDoc. 1.)  Lee contacted the FBI several months after the homicides after
23  seeing the phone number on a reward poster, and initially denied knowing who was
24  responsible for the homicides as she was highly intoxicated and had a "foggy memory," and
    suggested that the FBI contact Mecheryl Begay, Ervin Begay, Halbert Yazzie, and Alfred
25  Bennie Lee because there were rumors in the community that they were involved in the
    homicides.  (CRDoc, 93, at 34-38, 46-50, 53)  Lee testified at trial that it wasn't until several
26  contacts with the FBI, and approximately **19 months** after the homicides that Lee "told the
27  truth" and implicated Movant.  (Id., at 59-61.)  Lee also testified at trial that Movant had
    urged her to say, when asked, that either Ervin Begay, Halbert Yazzie or Alfred Bennie Lee
28  were the ones who committed the crimes.  (Id., at 44-45.)

- 4 -

1        The next break in the investigation came four years after the shootings, in May
2   2006, when the FBI re-contacted Clark, and he implicated Movant for the first time.
3   Although Lee only witnessed the shooting's aftermath, Clark was the sole witness to testify
4   to the events leading up to the shooting itself.  Clark testified at trial that he had attended
5   a party the night of the shootings with Movant and other friends.  Clark, Movant and the
6   friends left the party and got into a truck driven by Movant.  Clark recalled Movant pulling
7   his vehicle off the road, at which time Clark exited the vehicle to relieve himself.  He stated
8   that he observed Movant from a distance, appearing simply as "a black figure" in the night,
9   walk initially to the victims' car, stand by the car for a minute or two, then walk back to his
10  truck and retrieve an object from the driver's side, and then walk back  to the victims' car.
11  He saw Movant lift the object he had retrieved from the truck up to his shoulder and then
12  heard gunshots and saw sparks.  Clark recognized the gunshots coming from a rifle that
13  Movant had used on previous occasions when he and Clark had gone shooting together.

14       When the gunfire ceased, Clark asked Movant why he shot the victims, but Movant
15  did not respond.[8]  Movant simply told Clark to get back into the truck.  Later that night
16  when Movant dropped Clark off at his house, Movant told Clark to keep quiet. The next
17  morning, Movant told Clark not to say anything to the FBI, and to "watch himself."
18  Movant also told Clark  to "watch his back" several times after the shootings.

19       Movant proceeded to trial and, on June 26, 2007, was convicted of two counts of
20  First-Degree Murder, and two counts of Using, Brandishing, or Discharging a Firearm in
21  Relation to a Crime of Violence.  (CRDoc. 66.)  Movant was sentenced to life
22  imprisonment on the murder counts, to be followed by consecutive sentences of 120-
23  months and 300-months, for a total of 35-years for the firearms convictions. (CR Doc. 70.)

24       B. Statement of Facts - Appeal.

25       Movant appealed his conviction and sentence. (CR Doc 71.)  A three-judge panel
26  reversed the murder convictions on grounds of insufficient evidence, affirmed the firearms

27  _____

28       [8]See, fn 5, supra.

1  convictions, and found that the trial court did not err in admitting at trial evidence of
2  Movant's intimidation of witnesses Clark and Lee.  United States v. Begay, 567 F.3d 540,
3  550 (9th Cir. 2009), cert. denied, 132 S. Ct. 754 (2011).  The case was reheard *en banc,* and
4  the panel affirmed Movant's convictions.  United States v. Begay, 673 F.3d 1038 (9th Cir.
5  2011).  The panel reversed the 3-judge panel's finding that there was insufficient evidence
6  presented at trial of premeditation, and found without merit Movant's claims that (1) the
7  district court erred when it refused to instruct the jury on a lesser included offense of
8  voluntary  manslaughter; (2) the evidence that Movant intimidated Clark and Lee was
9  inadmissible under Federal Rules of Evidence 403 and 404(b); and (3) the prosecutor
10  engaged in misconduct by misstating the elements of premeditation during closing
11  argument.  Id.

12  　　　C. Motion under 28 U.S.C. §2255 - Supplemental Evidence.

13  　　　Movant raised eleven claims in his §2255 motion.  This supplemental report and
14  recommendation only addresses claims one and nine - ineffective assistance of counsel
15  claims- as Movant asserts that, since the filing of the original report and recommendation,
16  additional evidence has surfaced in support of these claims.[9]

17  **STANDARD**

18  　　　The two-prong test for establishing ineffective assistance of counsel was set forth
19  by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on an
20  ineffective assistance claim, a convicted defendant must show (1) that counsel's
21  representation fell below an objective standard of reasonableness, and (2) that there is a
22  reasonable probability that, but for counsel's unprofessional errors, the result of the
23  proceeding would have been different.  See id. at 687-88. There is a strong presumption

24  ────────────

25  　　　[9]18 U.S.C. §2255 requires the court to hold an evidentiary hearing "[u]nless the
26  motion and the files and records of the case conclusively show that the prisoner is entitled
   to no relief."  See, United States v. Burrows, 872 F.2d 915, 917 (9th Cir. 1989) (citations
27  omitted) (an evidentiary hearing is usually required if a claim is based on matters outside the
   record).  This Court did not hold an evidentiary hearing in this case, as the parties do not
28  dispute the facts, only the significance of them.

1   that a counsel's conduct falls within the wide range of reasonable assistance.  See id. at

2   689-90.  The inquiry under Strickland is highly deferential and "every effort [must] be

3   made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

4   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

5   the time."  Id. at 689.  The burden is on the defendant to overcome this presumption.

6   Michel v. Louisiana, 350 U.S. 91, 101 (1955).  The strategic choices a counsel makes after

7   thoroughly investigating the law and the facts of the case are unlikely to withstand a

8   challenge.  Strickland, 466 U.S. at 690-91. The Ninth Circuit has held that counsel must

9   conduct a "reasonable investigation" in order to make informed decisions about how to best

10  represent the client, and must make "reasonable decisions" about what particular

11  investigation is unnecessary.  Hendricks v. Calderon, 70 F.3d 1032, 1036 (9th Cir. 1995)

12  (citations omitted).  Without an identification of what benefit additional investigation

13  would reveal, a defendant cannot meet the prejudice prong of the Strickland test.  Id., 70

14  F.3d at 1042 (citing James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

15                                    **CLAIMS**

16  Claim One - trial counsel rendered ineffective assistance by failing to investigate an
     alternative shooter (Alfred Bennie Lee Jr.) theory of defense.

17  A.  Evidence of Lee Jr.'s "Confession."

18          Movant alleges that Loyd Tate, Movant's trial counsel, was ineffective in failing to

19  properly investigate  an alternative shooter theory. Movant alleges that trial counsel failed

20  to present evidence that Albert Bennie Lee Jr. ("Lee Jr.") confessed to the crimes.  In his

21  opening statement, Movant's trial counsel told the jury that it was going to hear that "a

22  couple of other people, yes, Mr. Alfred Bennie Lee Jr. was responsible for this murder."

23  (CVDoc. 2 at 3; CRDoc. 91, at 24-25.)   Trial counsel attempted to bring in Lee Jr.'s

24  confession through agent Jones, who was aware of the statement Lee Jr. allegedly made to

25  a Navajo Nation police officer, but the Government's hearsay objection was sustained.

26  (CRDoc. 91, at 107-110.)  Trial counsel stated that "[o]ur contention is going to be that

27  Alfred Benny (sic) Lee Jr. confessed to these murders," and argued that the evidence was

28

1   the "heart" of his case.  (Id.)  Trial counsel suggested that the statements weren't hearsay,

2   because they were being introduced to explain agent Jones's mental state "as to what he

3   then [did in his investigation]" (Id.)  Trial counsel also attempted to introduce Lee Jr.'s

4   confession through witness Jessica Lee, by asking her if she was aware of the confession,

5   but again, the Government's hearsay objection was sustained. (CRDoc. 93, at 56-57.)  The

6   trial court instructed the jury at the beginning and end of the trial that statements or

7   questions of counsel are not evidence. (CRDoc. 91, at 6; CRDoc. 95, at 63.)  No evidence

8   of Lee Jr.'s confession was ultimately presented at trial.  (CVDoc. 2, at 4.)

9        The evidence of Lee Jr.'s confession was provided by the Government to Movant

10  and consisted of private investigator Reuben Martinez's August 26, 2006, memorandum

11  of a report of telephonic contact with Dorasita Begay (hereinafter "Begay"), a Navajo

12  Nation Police Officer working out of Dilkon, Arizona. (CVDoc. 14-2.)  Mr. Martinez

13  reported that Begay told him that she  was familiar with the shooting of the victims in this

14  case, and that prosecution witness Jessica Lee had been a friend of Begay's for most of her

15  life.  (Id.)  Begay also stated that Jessica Lee had worked for her grandfather, Alfred

16  Bennie Lee Sr., who was a bootlegger on the Navajo nation, and that Lee Sr., would

17  sometimes take firearms in receipt, which Lee Jr., his son, would sometimes sell.  (Id.)

18  Begay reported to Martinez that Jessica Lee was known to be a liar especially when under

19  pressure.

20       Begay also told Martinez that two weeks previously she had been involved in a high

21  speed chase involving Lee Jr. (CVDoc. 14-2.)  Begay reported that:

22       Lee had two occupants in the vehicle who told her that during the chase Lee,
         the driver, attempted to load a handgun he had.  She was told that the
23       occupants took the weapon away from Lee so he would not do anything
         stupid if and when he was confronted by the police.  She advised that she
24       handcuffed Lee, who she indicated was drunk, and placed him in her patrol
         car.  When Lee complained that the handcuffs were too tight, she attempted
25       to loosen them.  Lee broke away from her, and she was eventually able to re-
         arrest him after a foot chase.
26
         Lee, who suffers from a heart condition, then told her that he was tired of
27       running.  He asked her if she remembered the shooting of those two people.
         She told him that she did.  Lee then told her that he was the one that shot
28       them.  He told her that he used a 30.06 rifle to shoot them, and that the

shooting was over a drug deal that went bad.[10]  He indicated that he was owed $100.00 for drugs he had sold them.  Lee asked her if Kendrick (Begay) was okay, as he knew that Kendrick was being charged with the murders.  Begay advised that she told Lee that he was drunk and that he had better stop talking.

(CVDoc. 14-2.)

After learning of the Martinez report, approximately 3-weeks later, FBI agents interviewed Begay at her place of employment, the Navajo Department of Public Safety. (CVDoc. 14-3.)  Begay reported that Jessica Lee is her cousin and came to live with her family on and off as a teenager as her father had died and her mother had abandoned her. (Id.)  She further related that the basis for her earlier statement to Martinez that Jessica would lie to get out of trouble was based upon her behavior as a teenager sneaking out late at night and cut school with friends.  (Id.)  Begay also clarified that Lee Sr. is also Lee's grandfather.  Lee Jr. is their uncle.  (Id.)

Begay described her high speed chase of Lee Jr., in more detail to the FBI agents:

Approximately one month ago, she was dispatched to a disturbance call at her grandfather's house.  Another officer was also dispatched to the call. When they arrived, they were told by her grandfather that "Junior", Raymond Begay, Norbert Begay, and Monica Begay were all at his residence and were fighting but they had left just before they arrived in Raymond Begay's red Dodge pickup.  Dorasita and the other officer drove around the area and she passed the truck on Indian Route 15.  Dorasita did a u-turn and pursued the truck in order to pull it over the truck pulled away at a high rate of speed.  As she pursued, the truck passed several other vehicles in a very unsafe manner.  Dorasita backed off and kept the truck under observation because she did not want the pursuit to cause an accident.  Dorasita observed the truck exit the main road and on to a dirt road and then another dirt road. Dorasita continued to follow but the other unit got separated from them on the dirt roads.  Dorasita realized they were going to Raymond Begay's house and was close enough to them to see the pickup stop and see "Junior" get out of the driver's side and run around to the back of the house.  Dorasita pursued and found "Junior" sitting down behind the house and handcuffed him then placed him in the back of her patrol car.  Norbert Begay and Monica Begay were still in the truck and Raymond had gone into the house. Monica Begay showed Dorasita a gun that was in the truck and stated that "Junior" was trying to load it while they were being pursued.  Dorasita took the gun and later booked it as evidence.  Dorasita did not think it was safe to attempt a field sobriety check on "Junior" and she knew he had a heart condition and she would not be able to book him into the jail as the Navajo

---

[10]During trial, Movant's counsel attempted unsuccessfully to introduce the fact that an anonymous caller had telephoned the police just days after the homicides and stated to the dispatcher that the killings were for a drug deal gone bad.  (CRDoc 91, at 95-101.)

Nation has a policy of not accepting prisoners with health issues so she cited him for reckless driving and no driver's license. Dorasita then drove "Junior" back to his residence in Greasewood Springs.

Dorasita said on the way back to the residence "Junior" started complaining about the handcuffs being too tight. Dorasita stopped and got out of the patrol car to loosen the cuffs and as she was doing so, "Junior" was able to get away and ran to the other side of the road. Dorasita pursued and caught "Junior" just as he reached the side of the road. Because of "Junior's" heart condition, he could not run far or fast. After "Junior" was again secured in the vehicle, he stated he was tired of running and wanted to talk to the FBI or a Criminal Investigator (CI), someone he could trust. "Junior" started crying and rambling saying he was the one who shot those kids. Dorasita said she told him she would arrange to have a CI talk to him but she did not want to get involved. "Junior" continued to talk saying, "it was me, I shot him with a 30.06; I didn't mean to shoot the girl." "Junior" did not say how many times he shot he just held his arms up simulating that he had a rifle and she assumed he only shot once. "Junior" also asked if Kenderick was okay. After making these comments, Dorasita told "Junior" he was drunk and to stop talking. Dorasita said when she got "Junior" to the house, his wife, Colleen was there and after she got him in the house, she forgot to get him to sign the citation. Dorasita said she never did talk to a CI about the statements "Junior" made nor did she attempt to contact anybody with the FBI.

(CVDoc. 14-2.)

Dorasita also told investigators that she was on paid administrative leave because of a public intoxication arrest by the Navajo Police. She did not prepare a report of her encounter with Lee Jr. (CVDoc. 91, at 109.)

FBI agents subsequently interviewed Lee Jr. on December 5, 2006. (CVDoc. 14-4.) Lee, Jr. indicated that he is related to Dorasita Begay, and recalled the night that she had pursued him in her patrol car. (Id.) He told the agents that, at some point during his contact with Dorasita, "because of his intoxicated state and his level of frustration with the Navajo Police," he stated to Dorasita, something to the effect of: "[w]hy don't you take me to jail for killing those kids." (Id.) Lee Jr. said that he was drunk and mad at the Navajo police and that he had said something like, "[y]ou're always harassing me; you're always trying to convict me of something; so why don't you just take me to jail for killing those kids?" (Id.) Lee Jr. denied having anything to do with the shootings and did not know who was responsible. (Id.)

B.  Trial counsel's Investigation.

Trial counsel stated in his deposition that Movant told him from the beginning of his representation that he was innocent.  (CVDoc. 71-1, at 19.)  Although trial counsel obtained approval from the Court to pay an investigator to assist him, he did not utilize the investigator to interview any witnesses.  (CRDoc. 23; CVDoc. 27, at 5; CVDoc 71-1, at 51.)  Trial counsel was aware of the "confession" of Lee Jr., and wanted to get it before the jury.  (CVDoc. 71-1, at 20-23.)  In describing his thought process, trial counsel stated:

> But I felt that the Government's counterpunch - - I didn't want - - no, let me just say it the way I'm feeling it.  I for damned sure didn't want Alfred Bennie Lee Jr. there because he was going to remove all doubt.  I wanted to raise some doubt, but I knew she could disprove it what I was going to put out there.  So I wanted to get the subject of Alfred Bennie Lee Jr. out there to raise reasonable doubt without having - - giving her the ability to counterpunch or come back at me on this.  Because I was weighing out and figured, "Yea, she's going to be able to disprove this.  But I wanted to get it out in front of the jury."

(Id., at 24.)

When counsel for Movant asked trial counsel what was the basis for him saying in his opening statement at trial that the jury would find that Lee Jr. committed the crimes, he responded:

> If we tried to bring [Lee Jr.] there, she was going to be able to go back and disprove whatever, police officer and all that kind of stuff.  I remember asking and knowing that I was going to ask the hearsay question about [Lee Jr.] and I remember being chided by [the trial judge] for asking the hearsay question.  But I knew we couldn't - - we didn't have a strong defense with that.  So to use other vernacular, I wanted to plant the satchel and run, get [Lee Jr.]'s name out there connected with a confession.  But I didn't want [Lee Jr.] there, because I knew that she - - that the Government would walk us down and - - and zoom in on making [Lee Jr.] if he was there.

(CVDoc. 71-1, at 36.)

Movant's trial counsel was confronted with trial witness lists that had included Lee Jr.'s name in an earlier version, but not in a later version, and asked what he would have done if the Government had called Lee Jr. as a witness and he denied committing the offenses:

> I think we end up having to bring back the officer, what's her name - - whatever her name was, bring her in.  And I didn't want to get into her either to bring her in. ...I wanted to get as much mileage as I could without having to call [Lee Jr.] in because I don't expect for him to get on the stand and confess to a double homicide.  And, again, I felt the Government was going

1   to have a very effective response.  So I wanted to get that in.  And sometimes
2   you want to get out as much as you can without having the witness there
    because of what the Government's going to get out of the witness.  I believe
3   that was my thinking for this whole [Lee Jr.] issue.
    (CVDoc. 71-1, at 48-49.)

4       To summarize, trial counsel did not attempt to interview, and elected not to call
5   either Lee Jr., or Dorasita Begay as witnesses at trial, for strategic reasons, and thought he
6   could introduce evidence of Lee Jr.'s confession through other witnesses.  Trial counsel
7   believed that the confession of Lee Jr. was the heart of his defense.

8   C.  Application of law to facts.

9       Movant's trial counsel was aware of the August, 2006, statement Begay made to
10  investigator Martinez, as well as the subsequent interviews by the FBI of Begay and Lee
11  Jr., prior to trial.  Trial counsel admitted in his deposition that he did not attempt to
12  interview, or have interviewed either of them, and did not attempt to secure their attendance
13  at trial.  He was hoping to admit the "confession" of Lee Jr. through other witnesses, and
14  was confident enough in his ability to do so that he told the jury in his opening statement
15  that Lee Jr. was responsible for the murder.  Trial counsel attempted to elicit the confession
16  through agent Jones to show his mental state, and Jessica Lee, to determine whether or not
17  she was "aware" of the confession, but the Court sustained the Government's objections,
18  ruling that the confession was hearsay.

19      Trial counsel's attempt to introduce Lee Jr.'s confession through agent Jones and
20  Jessica Lee was misguided and fell below an objective standard of reasonableness.  His
21  arguments to the Court were specious.  Hearsay is an out-of-court statement made by a
22  declarant that a party offers in evidence to prove the truth of the matter asserted in the
23  statement.  Fed.R.Evid. 801(c).  The trial court correctly noted that "the only relevance of
24  [the confession] is for the truth of the matter asserted that [Lee Jr.] confessed to the crime."
25  (CRDoc. 93, at 57.)  The trial court then asked counsel, "Is there some other relevance,"
26  to which counsel responded, "No, sir."  (Id.)  Trial counsel simply could not articulate an
27  evidentiary basis for the introduction into evidence of the confession of Lee Jr. through
28  another witness.

1   Trial counsel explained his decision not to call either Lee Jr. or Begay during his
2   deposition: that he believed Dorasita Begay to be an unhelpful witness, and that the
3   Government would have a very effective response, that he didn't expect Lee Jr. to confess
4   on the witness stand, and that he expected to introduce the confession through other
5   witnesses so that he could effectively "plant the satchel and run."  Trial counsel does not
6   explain what response the Government would have, if Lee Jr. or Dorasita Begay testified
7   at trial.  In its pleadings, the Government asserts that trial counsel was "correct in his
8   evaluation of the effectiveness of [] Begay as a witness."  (Doc. 67, at 6.)

9       This Court cannot conclude that the evidence the Government has identified that
10   would impeach Dorasita Begay would have the effect of destroying her credibility.  Begay
11   had no motive to fabricate Lee Jr.'s confession.  She was Lee Jr.'s niece and apparently did
12   everything she could to keep the confession quiet.  She encouraged Lee Jr. not to repeat it,
13   as a law enforcement officer should have reported it and didn't, told Lee Jr. that she would
14   have an investigator talk to him but didn't follow up, did not write a report of the incident,
15   and only gave Lee Jr. a reckless driving ticket (which she never had him sign) despite the
16   fact that he fled law enforcement, tried to load a firearm during the chase, and drove
17   intoxicated during a high speed chase with other individuals in the car.  If anything, this
18   "impeachment evidence" that trial counsel was concerned about and the Government
19   asserts would destroy Dorasita's credibility is in reality strong evidence of Dorasita's
20   motivation to cover-up Lee Jr.'s confession, and arguably add credibility to it.  The fact that
21   she may have ultimately been dismissed as a law enforcement officer for public
22   intoxication is simply evidence consistent with her arguable willingness to compromise her
23   law enforcement duties and responsibilities to protect the interests of a relative.  In
24   addition, Begay is a cousin to Jessica Lee, and stated that Lee had worked for Lee Jr.'s
25   father, a bootlegger, and opined that Jessica Lee is untruthful.  Begay could have been a
26   witness to the relationship between Lee and Lee Jr., and the credibility of witness Lee.

27       In addition, although Lee Jr. was reportedly intoxicated when he confessed, and
28   subsequently denied the statements, his description of his involvement was detailed enough

to lend authenticity to his confession.  Lee Jr. told Dorasita that he was "tired of running, that he "shot those kids," that he didn't mean to shoot "the girl," and that he shot "him" with a 30.06 rifle, that it was for a drug deal gone bad, and that the victim owed him $100.00.  Lee Jr. also reportedly sold firearms that his father, Lee Sr., received in payment as a bootlegger.

The Ninth Circuit has repeatedly found that "[a] lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrate[s] his client's factual innocence, or that raises[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."  Avila v. Galaza, 297 F.3d 911, 919 (9th Cir. 2002).  See also, Vega v. Ryan, 757 F.3d 960, 968 (9th Cir. 2014) ("While *Strickland* protects strategic choices made after thorough investigation of law and facts," had defense counsel known of the victim's recantation to her clergyman, "there was no strategic reason for not calling [the clergyman] as a witness.") (internal quotes and citation omitted).  Any argument that evidence of Lee Jr.'s confession would have harmed Movant's case is incredible.  The evidence supported Movant's theory of defense, and the fact that it was not admitted deprived the jury of the opportunity to consider this evidence and decide its significance.  Trial counsel's performance with regard to this evidence fell below an objective standard of reasonableness.

> Claim Two - trial counsel rendered ineffective assistance by failing to investigate and present evidence that Movant did not have access to the weapon used in the homicide (pawn shop evidence).

A.  Evidence of Pawn Shop Records.

The evidence at issue consists of pawn shop records from T&R Market, Inc., which show that on January 5, 2002, Movant pawned a rifle - a Norinco SKS rifle. (CVDocs. 12-1, 12-2.)  It is undisputed that trial counsel was aware of these records prior to trial.

B.  Trial Counsel's Investigation.

Testimony at trial established that the firearm used to shoot the victims was a rifle capable of shooting .30 caliber bullets.  Clark testified that three or four weeks prior to the shootings, he had gone shooting with Movant, and that Movant had an SKS rifle that, when

1  shot, sounded like the rifle he heard the night of the shooting.  (CRDocs. 91, at 140; 93, at

2  9.)  He testified that the SKS rifle that he had previously shot with Movant "had a folding

3  stock, a 30-round clip, and it had a bayonet." (CRDoc. 91, at 140.)  Clark also testified that

4  he told investigating officers that Movant had pawned all of his guns, and did not deny that

5  he had gone with Movant to pawn the weapon at T&R Market  (CRDoc. 93, at 17.)

6       During his deposition, trial counsel admitted that he had not done any investigation

7  into the pawn shop records, for instance, to discover whether or not the SKS rifle in pawn

8  "had a folding stock, a 30-round clip, and a bayonet" or whether or Clark could identify it

9  as the one he had shot with Movant on the previous occasion, because he knew that  the

10 pawn shop evidence "would show that [Movant] pawned an SKS, not necessarily the SKS."

11 (CVDoc. 71-1, at 29.)  Trial counsel was concerned that, "we were going to be able to

12 show that, yes, he pawned some weapons[,] [b]ut the Government was going to be able to

13 come back and counterpunch and show, I think through Mr. Clark, that we - - that [Movant]

14 went firing the SKS after this was pawned. ... And, again, my thought was what can - - how

15 can we put out a defense without the Government coming back with a devastating

16 response." (Id., at 26.)  Trial counsel was also concerned that the pawn shop records would

17 know that Movant knew how to shoot an SKS-style rifle and had actually owned one.

18 (CRDoc. 71-1, at 63.)

19      The most obvious flaw in trial counsel's explanation for failing to investigate the

20 pawn shop record relating to the SKS rifle is that Clark did testify at trial that he had shot

21 an SKS rifle with Movant three to four weeks before the homicides; thus, the damaging

22 evidence was before the jury. Despite this, the pawn shop records were consistent with a

23 plausible argument that this SKS rifle was in pawn prior to the shootings for several

24 reasons:  (1) Clark told investigators in 2002 that Movant had pawned his guns before the

25 shooting, (2) Clark's statement that he had gone shooting with Movant 3 to 4 weeks before

26 the homicides was given 5-years after the homicides, and, under that circumstance, is not

27 that far off from the actual 11-week interval between the time the rifle was pawned and the

28 homicides, and (3) Clark initially lied to investigators about the homicides, and did not

1   ultimately reveal the "truth" until 4 years after the murders.  The cumulative affect of this
2   evidence bears directly on Clark's memory and credibility.  Also, trial counsel raised the
3   issue at trial about Movant having some "guns" and that they had all been pawned, and that
4   Clark had been with Movant when they were pawned, during cross-examination of Clark.
5   (CRDoc. 93, at 17.)  Thus, further evidence that Movant was familiar with or owned a rifle
6   would not have undermined trial counsel's argument that any firearms that Movant owned
7   were in pawn at the time of the homicides.

8       Trial counsel does not adequately explain why he did not further investigate the
9   pawn shop records, or how a compelling argument could not have been made that Movant's
10  SKS rifle, which Clark so vividly described, was pawned a few months prior to the
11  homicides.  The only "counterpunch" by the Government would be to highlight the
12  evidence already before the jury, that is, the accuracy of Clark's recollection of when he
13  and Movant had gone out together to shoot a rifle, and the fact that the pawn shop records
14  do not conclusively prove that Movant did not have access to a different rifle to carry out
15  the homicides.

16      It is difficult to conceive how this evidence would have hurt the defense in this case,
17  and even harder to conceive of how it would not have been helpful to the defense. Trial
18  counsel's failure to further investigate the pawn shop records, or to seek their introduction
19  into evidence fell below an objective standard of reasonableness.

20                                      **PREJUDICE**

21      Movant must affirmatively prove prejudice by "show[ing] that there is a reasonable
22  probability that, but for counsel's unprofessional errors, the result of the proceeding would
23  have been different.  A reasonable probability is a probability sufficient to undermine
24  confidence in the outcome."  Strickland, 466 U.S. at 694. The prejudice component
25  "focuses on the question whether counsel's deficient performance renders the result of the
26  trial unreliable or the proceeding fundamentally unfair."  Lockhart v. Fretwell, 506 U.S.
27  364, 372 (1993) (citing Strickland, 466 U.S. at 687).

28

1   Due to trial counsel's failure to investigate and present evidence of Lee Jr.'s

2   confession, Movant was deprived of the right to fully defend his case. "Few rights are

3   more fundamental than that of an accused to present witnesses in his own defense."

4   Chambers v. State of Mississippi, 410 U.S. 284, 301 (1973). In Chambers, the defendant

5   had been charged with the murder of a state trooper, and, during trial, was limited by the

6   court in the cross-examination of a witness who had confessed to having been the shooter.

7   The witness admitted that he had confessed, but recanted, asserting that a clergyman had

8   talked him into confessing by promising that the witness would not go to jail and would

9   share in proceeds of a putative false arrest lawsuit.  (Id., at 1044).  Defendant was

10  prevented by the court from treating the witness as an adverse witness, or challenge directly

11  the witnesses renunciation, and furthermore, was prevented from introducing the testimony

12  of three other witnesses who separately had heard the witness confess.  (Id.)  The United

13  States Supreme Court reversed the defendant's conviction, noting that,

14      In the exercise of [the fundamental right to present witnesses in his own
15      defense], the accused, as is required by the State, must comply with
        established rules of procedure and evidence designed to assure both fairness
        and reliability in the ascertainment of guilt and innocence. Although perhaps
16      no rule of evidence has been more respected or more frequently applied in
        jury trials than that applicable to the exclusion of hearsay, exceptions tailored
17      to allow the introduction of evidence which in fact is likely to be trustworthy
        have long existed.  The testimony rejected by the trial court here bore
18      persuasive assurances of trustworthiness and thus was well within the basic
        rationale of the exception for declarations against interest.  That testimony
19      was critical to Chambers' defense.  In these circumstances, where
        constitutional rights directly affecting the ascertainment of guilt are
20      implicated, the hearsay rule may not be applied mechanistically to defeat the
        ends of justice.
21  (Id., at 302).

22      In Cannedy v. Adams, 706 F.3d 1148 (9th Cir. 2013), the Ninth Circuit Court of

23  Appeals found that it was objectively unreasonable for the state court to conclude that trial

24  counsel rendered effective assistance when he failed to interview a witness who would

25  testify that the victim fabricated her allegations of molestation and stated a motive for

26  doing so. 706 F.3d at 1162. The Court then found that, in determining prejudice, "[it] must

27  first consider whether [the evidence] could have been admitted at trial," ... and "[i]f the

28  evidence could have been admitted, [] whether there was a reasonable probability that it

1    would have affected the outcome of the proceeding." Id., at 1163.  "What matters is

2    whether a competent lawyer would have been able to introduce the evidence, in some form,

3    at trial." (Id.) (citing Wiggins v. Smith, 539 U.S. 510 (2003)).

4        A defendant has a clearly established federal constitutional right to present a

5    complete defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  The right to present

6    relevant evidence is not unlimited, but subject to "reasonable restrictions, such as

7    evidentiary and procedural rules." Moses v. Payne, 543 F.3d 1090, 1101 (9th Cir. 2008)

8    (citation and internal quotes omitted); 555 F.3d 742 (amended on den. of rehrg).

9    "Evidentiary rules do not violate a defendant's constitutional rights unless they 'infring[e]

10   upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes

11   they are designed to serve.'" Id., at 1102, 757 (citing Holmes v. South Carolina, 547 U.S.

12   319, 326 (2006)).  It is difficult to narrow to one the evidentiary or procedural rule which

13   would have supported the admission of Lee Jr.'s confession at trial, because Movant's

14   counsel did nothing to discover if Lee Jr. or Begay were available to testify, failed to

15   interview them, and failed to educate the trial judge adequately as to the confession and all

16   of the circumstances surrounding it.  There are a multitude of conceivable avenues,

17   however: (1) Lee Jr. testifying consistent with his confession - not hearsay, relevant; (2)

18   Lee Jr. testifying inconsistent with his confession - impeachment with prior inconsistent

19   statement; (3) Lee Jr. declared unavailable - confession admitted as statement against

20   interest having sufficient indicia of trustworthiness/residual exception to the hearsay rule;

21   (4) Lee Jr. testifying inconsistent with his confession, denies confession - Begay called as

22   a witness to impeach Lee Jr.  Trial counsel explored none of these avenues of admissibility.

23        "[E]xceptions tailored to allow the introduction of evidence which in fact is likely

24   to be trustworthy have long existed." Chambers, 410 U.S. at 302.  "[T]he exclusion of

25   [separately tried co-defendant's statement exculpating defendant] cannot be justified

26   merely by shouting hearsay!" Rivera v. Director, Dept. of Corr., State of Ill., 915 F.2d 280

27   283 (7th cir. 1990). See also, Welcome v. Vincent, Sup., Greenhaven Corr. Facility, 549

28   F.2d 853, 859 (2nd Cir. 1977) ("to restrict examination of a witness, so that his prior

confession may not be proven, is to deny the defendant a fair trial, at least when the confession, though retracted, has some semblance of reliability."). The confession of Lee Jr. bore indicia of trustworthiness: he was emotional when he confessed, his confession was to a close confidant, he described facts about the murders suggesting his personal involvement, said he shot the victim with a rifle and didn't mean to shoot the female victim, his statement about the killings being over a "drug deal gone bad" was consistent with an anonymous call received by police after the murders, and Lee Jr. worked for his father, a bootlegger, and traded guns for alcohol. The evidence against Movant consisted of the testimony of Clark and Lee. There was no physical evidence linking Movant to the homicides. Jessica Lee was highly intoxicated and did not observe the shootings, and additionally is related to Lee Jr., and also worked for Lee Sr., the bootlegger. Clark was initially dishonest with investigators, and did not provide his trial account until years after the murders.

In consideration of the trial evidence, along with the confession of Lee Jr., as well as evidence that Movant pawned a rifle consistent with the one used in the shooting just weeks before the shootings, the Court concludes that the errors of counsel had a substantial and injurious effect on the jury, in that it was deprived of hearing all of the relevant evidence in the case. There is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

### CONCLUSION

This Court having found a denial or infringement of Movant's constitutional rights that affected his right to a fair trial, this Court will therefore recommend that Movant's §2255 motion be granted, that judgment be set aside, and that a new trial be granted.

**IT IS THEREFORE RECOMMENDED** that Movant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (CV Doc. 1; CR Doc. 111) be **GRANTED**, that judgment be set aside, and that Movant be granted a new trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

    This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.  The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review.  See <u>United States v. Reyna-Tapia</u>, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  See Rule 72, Federal Rules of Civil Procedure.

15

    DATED this 7th day of November, 2014.

16
17
18

Michelle H. Burns
United States Magistrate Judge

19
20
21
22
23
24
25
26
27
28