**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenderick Begay, | No. CV-12-8237-PCT-DGC |
| Movant, | No. CR-06-0626-PCT-DGC |
| v. | **AMENDED ORDER** |
| USA, | |
| Respondent. | |

After his conviction was affirmed on appeal, Movant Kenderick Begay filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255.  CVDoc. 1; CRDoc. 111.[1] At the conclusion of briefing, United States Magistrate Judge Michelle H. Burns issued a Report and Recommendation ("Original R&R") recommending that the motion be denied.  CVDoc. 8.  Begay filed objections.  CVDoc. 11.  Shortly thereafter, Begay filed a motion to expand the record to include two documents: (1) an FBI report of an interview of Begay in 2002 during which he provided several pawn shop receipts, and (2) a pawn shop receipt for a Norinco SKS rifle pawned on January 5, 2012.  CVDocs. 12, 12-1, 12-2.  The Court granted the motion to expand the record and referred the case to Judge Burns to consider the additional evidence.  CVDoc. 15.  Judge Burns permitted additional discovery, and Begay's trial counsel was deposed.  Begay then filed a motion to supplement two of his claims.  CVDoc. 65.

---

[1] Consistent with the R&R, documents filed in this case, CV-12-08237-PCT-DGC, will be referred to as "CVDoc," and those filed in the related criminal action, CR-06-0626-01-PCT-DGC, will be referred to as "CRDoc."

1    On November 7, 2014, Judge Burns issued a Supplemental R&R recommending

2   that the § 2255 motion be granted and that Begay receive a new trial. CVDoc. 77. The

3   government filed objections to the Supplemental R&R (CVDoc. 84) and a motion to

4   strike parts of Begay's supplemental response (CVDoc. 87). Neither party requested oral

5   argument. For the reasons that follow, the Court will accept in part and reject in part the

6   Original R&R, accept the Supplemental R&R, deny the government's motion to strike,

7   set aside the judgment of conviction, and grant Begay a new trial.

8   **I.     Background.**

9    Neither party objects to Judge Burns' recitation of the facts in the Supplemental

10   R&R. The Court will restate them here.[2]

11    In the early morning hours of March 28, 2002, Begay left a party in
12   Greasewood, Arizona driving his truck, with passengers Loren Clark,
     Jessica Lee, Emmanley Begay (no relation to Begay), and Begay's sister
13   Mecheryl Begay. Only Loren Clark and Jessica Lee testified in Begay's
     trial (hereinafter "Lee" and "Clark"). According to Clark, around 2:00
14   a.m., Begay drove past the victims, J.T. and O.C., driving in the opposite
15   direction. Begay flashed his truck lights at their vehicle, and both vehicles
     pulled off of the highway and parked on a dirt side road. Begay got out of
16   his truck and stood for a minute by the driver-side door of J.T. and O.C.'s
17   vehicle. He then walked back to his truck, retrieved a rifle, walked back to
     the passenger side of the victim[s'] vehicle and fired eight or nine shots into
18   the vehicle. Begay walked back to his vehicle and placed the gun under the
19   back seat. As Begay walked back to his truck, Mecheryl began screaming
     and making horrible cries, asking him "What did you do?" or "Why did you
20   do that?" Begay told his sister to be quiet. Clark was outside Begay's
21   vehicle, having exited to relieve himself, and asked Begay why he had shot
     the victims. Begay did not respond. Begay, Clark, and Mecheryl drove
22   away, leaving Lee behind. Prior to the shooting, Lee was in the rear of
23   Begay's truck in a comatose state having consumed too much alcohol. The
     gunshots aroused her, at which point she exited the vehicle to vomit. As
24   she walked away from the scene, Lee observed O.C. attempting to hold J.T.
25   upright and that J.T. had blood on his shirt.

26

27   _____

28    [2] Judge Burns' statement of facts is based largely on those recited in the Ninth
     Circuit's *en banc* opinion affirming Begay's conviction. *See United States v. Begay*, 673
     F.3d 1038, 1040-42 (9th Cir. 2011).

O.C. drove to the home of Clark's mother to seek help.  By that time, J.T. was already dead.  O.C. was thereafter transported to a local hospital before being transferred to a hospital in New Mexico.  O.C. died from her wounds three days later.

The FBI and Navajo investigators began investigating the murders but initially failed to make any significant progress.  Witnesses interviewed denied being out on the night of the homicides, and Begay told investigators that he was with his girlfriend the entire night.  Investigators located the crime scene two weeks after the homicides and located glass and six .30 caliber shell casings on the ground.

Six months later, in the Fall of 2002, Lee contacted the FBI and told them (over the course of several months . . .), and later testified at trial, that she had been at a party that night with Begay, Mecheryl Begay, Clark, and Emmanley Begay.  She admitted to drinking and that her memory had been impaired, but that she did remember leaving the party with the group.  Lee stated that she had passed out in the vehicle, but awoke upon hearing gunshots.  She saw the victims after they had been shot.  Lee testified that a few days after the murders she asked Begay what she should tell the police about the murders, and Begay told her to blame it on two other men.  Lee and Begay never spoke again.

The next break in the investigation came four years after the shootings, in May 2006, when the FBI re-contacted Clark, and he implicated Begay for the first time.  Although Lee only witnessed the shooting's aftermath, Clark was the sole witness to testify to the events leading up to the shooting itself.  Clark testified at trial that he had attended a party the night of the shootings with Begay and other friends.  Clark, Begay and the friends left the party and got into a truck driven by Begay.  Clark recalled Begay pulling his vehicle off the road, at which time Clark exited the vehicle to relieve himself.  He stated that he observed Begay from a distance, appearing simply as a "black figure" in the night, walk initially to the victims' car, stand by the car for a minute or two, then walk back to his truck and retrieve an object from the driver's side, and then walk back to the victims' car.  He saw Begay lift the object he had retrieved from the truck up to his shoulder and then heard gunshots and saw sparks.  Clark recognized the gunshots coming from a rifle that Begay had used on previous occasions when he and Clark had gone shooting together.

When the gunfire ceased, Clark asked Begay why he shot the victims, but Begay did not respond.  Begay simply told Clark to get back into the truck.  Later that night when Begay dropped Clark off at his house,

Begay told Clark to keep quiet.  The next morning, Begay told Clark not to say anything to the FBI, and to "watch himself."  Begay also told Clark to "watch his back" several times after the shootings.

Begay proceeded to trial and, on June 26, 2007, was convicted of two counts of First-Degree Murder, and two counts of Using, Brandishing, or Discharging a Firearm in Relation to a Crime of Violence.  Begay was sentenced to life imprisonment on the murder counts, to be followed by consecutive sentences of 120-months and 300-months, for a total of 35-years for the firearm convictions.

Begay appealed his conviction and sentence.  A three-judge panel reversed the murder convictions on the grounds of insufficient evidence, affirmed the firearms convictions, and found that the trial court did not err in admitting at trial evidence of Begay's intimidation of witnesses Clark and Lee.  The case was reheard *en banc*, and the panel affirmed Begay's convictions.  The panel reversed the 3-judge panel's finding that there was insufficient evidence presented at trial of premeditation, and found without merit Begay's claims that (1) the district court erred when it refused to instruct the jury on a lesser included offense of voluntary manslaughter; (2) the evidence that Begay intimidated Clark and Lee was inadmissible under Federal Rules of Evidence 403 and 404(b); and (3) the prosecutor engaged in misconduct by misstating the elements of premeditation during closing argument.

Doc. 77 at 3-6 (internal citations and footnotes omitted).

## II.   Standard of Review.

The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge.  *See* 28 U.S.C. § 636(b)(1).  The Court must undertake a *de novo* review of those portions of the R&R to which specific objections are made.  *See id.*; Fed. R. Civ. P. 72(b)(3); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  The Court need not review parts of the R&R to which neither party objects.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

The Original R&R addressed each of Begay's eleven claims of error.  Begay filed objections to Judge Burns' findings on Error 1 (trial counsel failed to investigate an alternate shooter, Alfred Bennie Lee Jr.), Error 5 (trial counsel improperly conceded the

- 4 -

1    evidence did not support a jury instruction for a lesser offense of voluntary

2    manslaughter), and Error 9 (trial counsel failed to investigate and present evidence that

3    Begay did not have access to the type of weapon used in the murders).  CVDoc. 11.

4    Because the Supplemental R&R reexamined Errors 1 and 9, the Court will disregard

5    Begay's objections to the Original R&R's treatment of those errors.  The Court will first

6    address Begay's objection to the Original R&R's treatment of Error 5, and then address

7    the government's objections to the Supplemental R&R's treatment of Errors 1 and 9.

8    **III.    Discussion.**

9         All of Begay's claims assert that his trial counsel rendered ineffective assistance.

10   The Supreme Court set out the test for ineffective assistance of counsel in *Strickland v.*

11   *Washington*, 466 U.S. 668 (1984).  "To establish ineffective assistance of counsel under

12   *Strickland*, a prisoner must demonstrate *both*: (1) that counsel's performance was

13   deficient, *and* (2) that the deficient performance prejudiced his defense."  *Miles v. Ryan*,

14   713 F.3d 477, 486 (9th Cir. 2013) (emphasis in original) (citing *Strickland*, 466 U.S. at

15   688-93).  Courts must "indulge a strong presumption that counsel's conduct falls within

16   the wide range of reasonable professional assistance," and attorneys are afforded "wide

17   latitude . . . in making tactical decisions." *Strickland*, 466 U.S. at 689. The reasonableness

18   of counsel's performance is judged under an objective standard.  *United States v. Davis*,

19   36 F.3d 1424, 1433 (9th Cir. 1994).  "[E]very effort [must] be made to eliminate the

20   distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

21   conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.*

22        "A defendant is prejudiced by counsel's deficient performance if 'there is a

23   reasonable probability that, but for counsel's unprofessional errors, the result of the

24   proceeding would have been different.'"  *Clark v. Arnold*, 769 F.3d 711, 725 (9th

25   Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  A reasonable probability is a

26   probability sufficient to undermine confidence in the outcome of a proceeding.  *Id.*

27   Begay "need not prove 'counsel's action more likely than not altered the outcome,' but

28   rather he must demonstrate that '[t]he likelihood of a different result [is] substantial, not

1    just conceivable.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

2    **A.    Error 1 – Lesser Offense Instruction.**

3    Begay argues that trial counsel erred in conceding there was insufficient evidence

4    to warrant a manslaughter instruction.  Judge Burns disagreed.  She correctly noted that it

5    is the defendant's burden to produce evidence tending to show the crime was an act of

6    passion "before the burden shifts to the government to 'prove beyond a reasonable doubt

7    the absence of sudden quarrel or heat of passion.'"  Doc. 77 at 10 (quoting *Begay*, 673

8    F.3d at 1045).  She also noted that no evidence was introduced at trial regarding Begay's

9    demeanor or his interaction with the victims.

10   Begay asserts that had trial counsel properly prepared, he could have introduced

11   evidence demonstrating adequate provocation.  *See United States v. McGee*, 465 F.

12   App'x 592, 593 (9th Cir. 2012) ("Under federal law, '[i]f the defendant killed with the

13   mental state required for murder . . . , but the killing occurred in the 'heat of passion'

14   caused by adequate provocation, then the defendant is guilty of voluntary

15   manslaughter.'" (quoting *United States v. Paul*, 37 F.3d 496, 499 (9th Cir. 1994))).

16   Begay fails to demonstrate, however, that any such evidence existed.  There were only

17   two witnesses to the murders, Jessica Lee and Loren Clark.  Neither overheard an

18   argument between Begay and the victims, nor did they testify that Begay said anything

19   during or after the interaction.  In fact, the record is largely devoid as to what transpired

20   before the shootings.  Begay's claim that such evidence exists is speculative.  Begay has

21   failed to meet his burden of showing deficient performance under the first prong of

22   *Strickland*.

23   **B.    Error 5 – Alternate Shooter Defense.**

24   Begay argues that trial counsel was ineffective because he failed to investigate

25   evidence that another individual was responsible for the murders and did not present the

26   evidence to the jury.  Judge Burns agreed.

27   **1.    Evidence Available Prior to Trial.**

28   On August 26, 2006, private investigator Reuben Martinez prepared a

- 6 -

memorandum describing his telephone conversation with Dorasita Begay, a Navajo Nation police officer. CVDoc. 14-2. Dorasita stated that she was familiar with the shootings of the two teenagers and that she had been a friend of Jessica Lee her entire life. She told Martinez that Jessica Lee's grandfather is Albert Bennie Lee, Sr., who "is the biggest bootlegger on the Navajo Nation." *Id.* at 1. She also said that Jessica worked for her grandfather in the past, and that Lee Sr. would often accept firearms in lieu of money and would sell them to people on the reservation. Dorasita stated that Jessica "is known to be a liar especially when placed under pressure." *Id.* at 2. In fact, she has seen Jessica "lie to get out of trouble with her teachers, parents and friends." *Id.*

At one point during the interview, Dorasita mentioned that she would like to speak with Martinez about the case in person and was "disappointed that [he] was not available to talk to her." *Id.* When pressed by Martinez, she told him the following:

> Two weeks ago she was involved in a high speed chase involving Alfred Benn[ie] Lee Jr. She advised that [Lee Jr.] had two occupants in the vehicle who told her that during the chase, [Lee Jr.], the driver, attempted to load a handgun he had. She was told that the occupants took the weapon away from [Lee Jr.] so he would not do anything stupid if and when he was confronted by the police.
>
> She advised that she handcuffed [Lee Jr.], who she indicated was drunk, and placed him in her patrol car. When [Lee Jr.] complained that the handcuffs were too tight, she attempted to loosen them. [Lee Jr.] broke away from her, and she was eventually able to re-arrest him after a foot chase.
>
> [Lee Jr.], who suffers from a heart condition, then told her that he was tired of running. He asked her if she remembered the shooting of those two people. She told him that she did. [Lee Jr.] then told her that he was the one that shot them. He told her that he used a 30.06 rifle to shoot them, and that the shooting was over a drug deal that went bad. He indicated that he was owed $100.00 for drugs he had sold them. [Lee Jr.] asked her if [Kenderick Begay] was okay, as he knew that [Begay] was being charged with the murders.
>
> [Dorasita] advised that she told [Lee Jr.] that he was drunk and that he had better stop talking.

- 7 -

*Id.*

A month later, retired Special Agent ("SA") John Charles Jones and SA McDonald Rominger of the FBI interviewed Dorasita at the Navajo Department of Public Safety, her place of employment.  CVDoc. 14-3.  When asked about her knowledge of the murders, Dorasita stated that she heard about the incident from Jessica Lee and Philbert Edgewater.  *Id.* at 1.  She mentioned that neither Jessica nor Philbert said that they attended a party that night or witnessed the shooting.  *Id.*  She also reaffirmed her belief regarding Jessica's truthfulness and denied that Jessica ever mentioned that she witnessed the murders.  Dorasita did mention, however, that "[b]efore Jessica moved to Texas, [she] heard through her aunt, Leona Lee that Jessica had considered collecting the reward which was offered for information on the shooting but she never heard anything further about it."  *Id.* at 2.  Dorasita confirmed that Alfred Bennie Lee Sr. is her grandfather, as well as Jessica's, and that he was a bootlegger who accepted guns in exchange for alcohol.  *Id.*  In addition, she confirmed that Alfred Bennie Lee Jr. is her and Jessica's uncle.  She also recalled her encounter with Lee Jr.:

> Approximately one month ago, she was dispatched to a disturbance call at her grandfather's house.  Another officer was also dispatched to the call. When they arrived they were told by [Lee Sr.] that [Lee Jr.], Raymond Begay, Norbert Begay, and Monica Begay were all at his residence and were fighting but they had left just before they arrived in Raymond Begay's red Dodge pickup.  Dorasita and the other officer drove around the area and she passed the truck on Indian Route 15.  Dorasita did a u-turn and pursued the truck in order to pull it over but the truck pulled away at a high rate of speed.  As she pursued, the truck passed several other vehicles in a very unsafe manner.  Dorasita backed off and kept the truck under observation because she did not want the pursuit to cause an accident.  Dorasita observed the truck exit the main road and on to a dirt road and then another dirt road.  Dorasita continued to follow but the other unit got separated from them on the dirt roads.  Dorasita realized they were going to Raymond Begay's house and was close enough to them to see the pickup stop and see [Lee Jr.] get out of the driver's side and run around to the back of the house.  Dorasita pursued and found [Lee Jr.] sitting down behind the house and handcuffed him then placed him in the back of the patrol car.  Norbert Begay and Monica Begay were still in the truck and Raymond had gone

into the house.  Monica Begay showed Dorasita a gun that was in the truck and stated that [Lee Jr.] was trying to load it while they were being pursued. Dorasita took the gun and later booked it as evidence.  Dorasita did not think it was safe to attempt a field sobriety check on [Lee Jr.] and she knew he had a heart condition and she would not be able to book him into the jail as the Navajo Nation has a policy of not accepting prisoners with health issues so she cited him for reckless driving and no driver's license. Dorasita then drove [Lee Jr.] back to his residence in Greasewood Springs.

Dorasita said on the way back to the residence [Lee Jr.] started complaining about the handcuffs being too tight.  Dorasita stopped and got out of the patrol car to loosen the cuffs and as she was doing so, [Lee Jr.] was able to get away and run to the other side of the road.  Dorasita pursued and caught [Lee Jr.] just as he reached the side of the road.  Because of [Lee Jr.'s] heart condition, he could not run far or fast.  After [Lee Jr.] was again secured in the vehicle, he stated that he was tired of running and wanted to talk to the FBI or a Criminal Investigator (CI), someone he could trust.  [Lee Jr.] started crying and rambling saying he was the one who shot those kids. Dorasita said she told him she would arrange to have a CI talk to him but she did not want to get involved.  [Lee Jr.] continued to talk saying, "it was me, I shot him with a 30.06; I didn't mean to shoot the girl."  [Lee Jr.] did not say how many times he shot he just held his arms up simulating that he had a rifle and she assumed he only shot once.  [Lee Jr.] also asked if [Kenderick Begay] was okay.  After making these comments, Dorasita told [Lee Jr.] he was drunk and to stop talking.  Dorasita said when she got [Lee Jr.] to the house, his wife, Colleen was there and after she got him in the house, she forgot to get him to sign the citation.  Dorasita said she never did talk to a CI about the statements [Lee Jr.] made nor did she attempt to contact anybody with the FBI.

*Id.* at 3-4.

Dorasita mentioned that the reason she was disappointed that Martinez could not speak with her in person is because she thought he was a FBI agent and would "follow up" with Lee Jr.  She also confirmed that Lee Jr. sold marijuana in the Greasewood Springs area since she was in high school and that Lee Jr. often "fights when he drinks." *Id.* at 4.  At the time of the interview, Dorasita was on paid administrative leave for a public intoxication arrest and was later fired.  She never prepared a report of the incident with Lee Jr.  CRDoc. 91 at 109.

1    In December 2006, SA Jones and SA Rominger interviewed Lee Jr. at the Navajo

2    County Jail.  CVDoc. 14-4.  Lee Jr. recalled the incident with Dorasita, stating that he

3    was "drunk and driving past 'Norbert's house' when he realized that there was a pursuing

4    Navajo Police vehicle behind him."  *Id.* at 1.  "At some point in the vicinity of Norbert's

5    house, he pulled over, jumped out of the car, and sat down."  *Id.*  Lee Jr. stated that

6    "because of his intoxicated state and his level of frustration with the Navajo Police, he

7    did recall stating to Dorasita Begay, 'Why don't you just take me to jail for killing those

8    kids,' or words to that effect."  *Id.*  Lee Jr. also stated that he said something like "You're

9    always harassing me; you're always trying to convict me of something; so why don't you

10   just take me to jail for killing those kids?"  *Id.*  SA Rominger reported that "[Lee Jr.]

11   indicated, without hesitation or equivocation, that he had nothing to do with 'killing those

12   kids' and that he did not know who was responsible for killing those kids."  *Id.*  The

13   agents read the statement Lee Jr. provided in 2003 and confirmed that the statement was

14   still true.

15              **2.    Trial Counsel's Performance.**

16   Begay's trial counsel was deposed on June 17, 2014.  He said in his deposition

17   that Begay told him from the beginning of the representation that he was innocent.

18   CVD0c. 71-1 at 19.  Although trial counsel obtained the services of an investigator to aid

19   in preparing the defense, he never had the investigator interview Dorasita, Lee Jr., or any

20   other witnesses.  CRDoc. 23; CVDoc. 27 at 5; CVDoc. 71-1 at 51.  Nor did trial counsel

21   interview Dorasita or Lee Jr.

22   During his opening statement at trial, counsel told the jury that "at the conclusion

23   of the trial . . . it's going to be clear that a couple of other people, yes, Mr. Alfred

24   Benn[ie] Lee Jr. was responsible for this murder[.]"  CRDoc. 91 at 24-25.  Later, when

25   cross-examining SA Jones, counsel attempted to introduce evidence of Lee Jr.'s

26   confession, but the Court sustained the government's hearsay objection.  *Id.* at 107-100.

27   At sidebar, counsel stated that "our contention is going to be that Alfred Benn[ie] Lee Jr.

28   confessed to these murders at that particular time" and that "this is the heart of our

case[.]"  *Id.* at 107.  Counsel argued that the statements were admissible to demonstrate SA Jones' "mental state as to what he then [did in his investigation]," but the Court disagreed.  *Id.* at 108.

Later in the trial, counsel asked Jessica Lee if she was aware of Lee Jr.'s confession, but the government's hearsay objection was sustained.  *Id.* at 56-57.  Ultimately, no evidence of Lee Jr.'s confession was presented at trial.

### 3.    Counsel's Explanation.

Trial counsel stated in his deposition that he was aware of Lee Jr.'s confession, he discussed it with Begay, and he "wanted to get it before the jury."  Doc. 71-1 at 22-23.  He was concerned, however, that the government might "counterpunch" and "disprove what [he] was going to put out there."  *Id.* at 23.  Therefore, his strategy was to get Lee Jr.'s confession "out there to raise reasonable doubt" without giving the government the opportunity to disprove it.  *Id.*  When asked why Lee Jr. was not on the final witness list, counsel stated that he "wanted to get as much mileage as [he] could without having to call [Lee Jr.] in because [he did not] expect for him to get on the stand and confess to a double homicide."  *Id.* at 47-48.  He also did not want to bring in Dorasita Begay because counsel expected "a very efficient response" from the government.  *Id.*

Counsel was also questioned regarding his investigation of the confession.  Although he knew that Begay's previous attorney had hired Martinez, he did not recall speaking with Martinez or attempting to obtain his interview reports.  *Id.* at 20, 52.  As already noted, counsel's court-appointed investigator did not interview any witnesses.  *Id.* at 51 (noting that the CJA Form 21 showed that the investigator conducted no interviews).  Instead, counsel opted to speak with potential witnesses "by trying to grab folks" outside the courtroom at Begay's sister's trial.  *Id.* at 50-51.

### 4.    Duty to Investigate.

"[C]ounsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client."  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis in original).  When appropriate,

this also requires articulating "a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691.  Thus, counsel is ineffective when he "neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995).

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that an attorney's failure to investigate the defendant's background and present mitigating evidence during sentencing violated the Sixth Amendment.  Counsel began the sentencing proceeding by telling the jury that it should "consider not just what [the defendant] 'is found to have done,' but also 'who [he] is.'" *Id.* at 526.  She also told the jury that it would "'hear that [the defendant] has had a difficult life,' [but] never followed up on that suggestion with details of [the defendant's] history." *Id.*  In addition, counsel abruptly ended her investigation into the defendant's background after receiving the pre-sentence report, which contained some background information.  *Id.* at 527.  Although she received funds from the Public Defender's office to retain a forensic social worker, "counsel chose not to commission such a report." *Id.* at 524.  The Supreme Court found that counsel's failure to investigate was the result of unreasonable professional judgment and led to an uninformed decision not to present a mitigation case. *Id.* at 534.

In *Sanders*, the Ninth Circuit found counsel's performance unreasonable for failing to "fulfill his duty to investigate [the defendant's] most important defense: that [the defendant's brother] was the shooter." 21 F.3d at 1457.  After the defendant was arrested, his brother confessed to the attorney and his mother.  *Id.* at 1450.  After a mistrial, the defendant hired another attorney.  *Id.*  The mother told the new attorney about the confession and the brother showed up at court to testify.  *Id.*  The defendant's attorney, however, ordered the brother to leave.  *Id.*  Although counsel argued at trial that the brother, not the defendant, was the shooter, he never called the brother to testify.  *Id.*  The Ninth Circuit found counsel's conduct unreasonable because he failed to interview the defendant's brother, failed to call the brother to testify at trial, did not attempt to introduce the confession via other means, and refused to listen to the defendant's mother

and brother when they showed up at his office.  *Id.* at 1456.  The Ninth Circuit noted that "whatever decision [counsel] might have made about calling [the brother] as a witness was not an *informed* one and thus could not be deemed '*strategic*.'"  *Id.* at 1457 (emphasis in original).  "[Counsel] failed to do what any competent lawyer would do when a witness indicates directly or indirectly that he, and not the lawyer's client, is guilty.  He did not attempt to obtain a statement from [the witness] confirming his admission of guilt."  *Id.*

### 5.    The Investigation in this Case.

As already noted, the Court must evaluate trial counsel's actions with a high degree of deference.  Even with that deference in mind, however, the Court concludes that trial counsel's investigation fell below an objective standard of reasonableness.

Trial counsel knew of (1) Begay's consistent assertion of his own innocence, (2) Dorasita's statement to Martinez describing Lee Jr.'s confession, (3) Dorasita's statement to the FBI describing Lee Jr.'s confession in very similar terms, and (4) Lee Jr.'s statement to the FBI admitting that he made a reference to the killings in his conversation with Dorasita.  Counsel nevertheless failed to interview Dorasita or Lee Jr. or have his investigator do so.  As in *Wiggins*, counsel obtained funds for an investigator, but no witnesses were interviewed.  As in *Sanders*, counsel failed to investigate Begay's most important defense – that Lee Jr. was the shooter.

Counsel's deposition explanations do not justify his failure to investigate.  He testified that he did not want to call Lee Jr. to testify at trial because he did not think Lee Jr. would confess to a double homicide in court and he thought Lee Jr.'s testimony "would remove all doubt."  Doc. 84-1 at 24.  Presumably counsel is suggesting that Lee Jr. would have convincingly testified that he did not commit the murders and did not confess to them.  But how was counsel to form any view on the content or effectiveness of Lee Jr.'s testimony without having interviewed him?  The Court cannot conclude that counsel acted reasonably in failing to interview a man who reportedly had confessed to the very crime with which his client was charged because counsel assumed the man

would deny committing the crime and would be a good witness at trial.  Without an interview, counsel was entirely unable to judge Lee Jr.'s credibility, evaluate his explanation of the supposed confession, hear his denial of being the shooter, or assess his susceptibility to cross-examination.

In addition, counsel was aware of information that could bolster the credibility of Lee Jr.'s confession.  Although intoxicated when he gave the alleged confession, Lee Jr. mentioned that the "two kids" were shot with a 30.06 rifle, that the shooting resulted from a drug deal gone bad, that the victim owed him $100, and that he did not mean to shoot "the girl."  These statements correctly identified the kind of rifle used in the murders and the fact that young woman did not appear to be the intended victim.  The statements were also consistent with Lee Jr. reportedly selling marijuana, and with his father often receiving firearms in exchange for alcohol – firearms Lee Jr. allegedly resold.  Moreover, Lee Jr. did not deny entirely the statements he made to Dorasita – he confirmed to the FBI that he did mention the murders when speaking with her.

Counsel's reason for not calling Dorasita was the government's ability to "counterpunch" – to discredit her testimony.  Doc. 84-1 at 24.  Counsel recalled that Dorasita had encountered problems with her employment in the Navajo police department and had a friendship with Begay.  *Id.* at 65-66.  The government's objection provides additional reasons that Dorasita would not have been a good witness:  Dorasita did not jail Lee Jr. as a result of his evading police; she failed to report the confession to her superiors or the FBI; she went drinking with Lee Jr. two weeks after the incident; she was a friend of Begay and his sister; she helped Begay wash his spray-painted name from the pavement after it had been put there as a result of suspicion in the community; and she was on administrative leave for public intoxication when she was interviewed by the FBI and was later fired.  Doc. 84 at 14-15.

The Court cannot conclude that these possible issues justified counsel's failure to interview Dorasita.  Her favorable treatment of Lee Jr. and her family relationship with him tend to bolster the credibility of her statements regarding his confession.  A favorable

relationship with Lee Jr. would make it less likely, not more likely, that she would falsely accuse him of confessing to the murders. Although it is true that cross-examination about her favorable relationship with Begay could have suggested a motive to point the finger at Lee Jr., and that her employment problems might have called her reliability into question, the Court cannot conclude that the risks from such cross-examination were so great as to justify never interviewing Dorasita.

Other factors bolstered the believability of Dorasita's account of Lee Jr.'s confession. Although her statements to the investigator and the FBI were taken over a month apart, they were consistent and detailed. In addition, as already noted, Lee Jr.'s statements were consistent with facts relating to the murder, his own drug dealing, and his access to weapons. In addition, Dorasita took steps to cover up the confession. She told Lee Jr. to stop talking, failed to write a report of the incident, failed to report the confession to her superiors or the FBI, and failed to arrange for an investigator to talk with Lee Jr. as he had requested. These actions can be viewed as consistent with her family relationship with Lee Jr. and her belief that the confession was true.

Trial counsel's failure to investigate Lee Jr.'s confession led to poor decisions during trial. As already noted, trial counsel told the jury during opening statements that they would hear evidence of Lee Jr's guilt. But his efforts to introduce such evidence were entirely ineffective. He knew that testimony by SA Jones about statements Dorasita made to Jones, regarding statements Lee Jr. made to Dorasita, was double hearsay. Any testimony by Jessica Lee would likely have been even further removed. And yet counsel's apparent strategy was to attempt to get this hearsay into evidence as a passing reference during the testimony of two witnesses who never heard the confession – to "plant the satchel and run." During trial, counsel was unable to articulate any reasonable argument as to why the testimony by SA Jones and Jessica Lee about the confession was admissible. Like counsel in both *Wiggins* and *Sanders*, counsel began trial by planting the central defense in the mind of the jury and then failed to present evidence in support.

In summary, the Court concludes that counsel's failure to investigate evidence at

the heart of Begay's defense was objectively unreasonable.  Not only did it deprive counsel of first-hand information with which to evaluate Lee Jr. and Dorasita as witnesses, it also deprived him of other evidence that an investigation of the confession might have produced.  And it resulted in poor and uninformed decisions during trial.

## C.    Error 5 – Pawn Shop Evidence.

Judge Burns also found that trial counsel was ineffective for failing to investigate and present evidence that Begay did not have access to the weapon Loren Clark said was used to commit the murders.  Clark – the only eyewitness to the actual shooting who testified at trial – said that he saw Begay fire a rifle into the victims' vehicle eight or nine times.  CRDoc. 91 at 140-41.  He testified that he recognized the weapon as a SKS rifle he had shot with Begay "three or four weeks" prior to the murders, and that he recalled the "popping sound."  CRDoc. 93 at 9.  Clark stated that the SKS rifle had a "folding stock, a 30-round clip, and it had a bayonet."  CRDoc. 91 at 141.  Further testimony established that the shells found at the scene were .30 caliber and compatible with a SKS rifle.  CRDoc. 91 at 75.

Trial counsel was aware of two pieces of evidence prior to trial: (1) a May 13, 2002, interview of Begay conducted by the FBI in which Begay presented several pawn receipts, and (2) a pawn shop receipt indicating Begay pawned a Norinco SKS rifle on January 5, 2002, almost three months before the murders.  CVDocs. 12-1, 12-2.  Instead of investigating the evidence and seeking to introduce it at trial, counsel opted to cross-examine Clark about Begay's guns:

> Q:    Now, the special agents also asked you on the 29th if you knew that [Begay] had some guns.  Do you remember that question?
>
> A:    Hmm, yeah.
>
> Q:    And you told the officers that you thought he did but that he had pawned all of those guns.  Isn't that correct?
>
> A:    Hmm, yeah.

1

2

> Q:    In fact, you went with [Begay] to pawn those weapons; isn't that correct?

3

> A:    Hmm, no.

4

5

> Q:    So you didn't go with [Begay] when he pawned the SKS rifle? You weren't with him?

6

7

> A:    No.

8

9

> Q:    So when you state here that you went with [Begay] to pawn – at T&R's to pawn those weapons in Gallup, the officer's mistaken, the special agent's mistaken when he writes that correct?

10

> A:    No.

11

12

13

14

CRDoc. 93 at 17.  Counsel did not question Clark further, nor did he inquire about the pawned weapons on cross-examination of SA Jones.  The pawn records were never placed in evidence.

15

16

17

18

19

20

21

At his deposition, counsel admitted that he did not investigate the pawn records because the evidence would only demonstrate "that [Begay] pawned an SKS, not necessarily *the* SKS."  CVDoc. 71-1 at 29 (emphasis added).  Counsel was also concerned that the government would "counterpunch and show, I think through Mr. Clark, that we – that [Begay] went firing the SKS after this was pawned," which could be a "devastating response."  *Id.* at 26.  Counsel feared that the records would establish Begay's familiarity with the weapon and that he had previously owned one. *Id.* at 63.

22

23

24

25

26

27

28

Like Judge Burns, the Court finds counsel's failure to investigate the pawn records and present them at trial to be objectively unreasonable.  Investigation could have revealed that Begay did pawn the SKS rifle and that the rifle had the same characteristics described by Clark, and might have shown whether Begay reacquired the rifle from the pawn shop.  In addition, counsel's "counterpunch" explanation makes little sense.  Clark testified on the first day of trial that he saw Begay fire the familiar SKS rifle at the victims.  Seeking to admit the records could not elicit more damaging evidence than had

1   already been presented.  The pawn records were consistent with Clark's statement in

2   2002 that Begay pawned the gun before the shootings, and could have been used to

3   undermine Clark's credibility, considering he lied to the investigators immediately after

4   the murders and did not come forward until four years later.  The fact that Clark said he

5   shot the SKS with Begay a few weeks before the murders appears to have been an

6   approximation – investigation might have enabled counsel to credibly suggest that the

7   shooting of the SKS occurred been before the weapon was pawned in January.

8          The government argues that counsel's decision was reasonable because admission

9   of the pawn records would confirm Clark's credibility in stating that a gun was pawned.

10   The government then would have relied on Clark's testimony that he shot an SKS with

11   Begay after the date of the supposed pawn to show that Begay had access to more than

12   one SKS.  This also would have shown, the government argues, that the SKS is Begay's

13   weapon of choice.

14          Although a closer question than the failure to investigate Lee Jr.'s confession, the

15   Court concludes that trial counsel's failure to investigate the pawning of the rifle and

16   introduce the pawn records in evidence was objectively unreasonable.   The key

17   eyewitness in the case, Loren Clark, testified that Begay shot the victims with an SKS

18   rifle that Clark had shot with Begay in the past.  This was very specific and direct

19   evidence of Begay's guilt.  It linked him directly to the murder weapon.  Proof that Begay

20   had actually pawned an SKS rifle three months earlier would have undercut this

21   evidence.  It certainly would have provided more concrete proof than trial counsel's

22   cross-examination of Clark as quoted above.  Although the government would have

23   responded with other arguments about how Begay could have used another SKS rifle, the

24   government cites no evidence that such a rifle existed, and defense counsel could have

25   argued, with the pawn receipt in hand, that the weapon about which Clark testified was

26   not in Begay's possession on the night of the murders.

27          **D.    Prejudice.**

28          As noted above, even if a petitioner demonstrates that counsel's performance was

- 18 -

1    deficient, he must still show prejudice.  Judge Burns found that Begay has established a
2    reasonable probability that, but for counsel's unprofessional errors, the result of the case
3    would have different.  Doc. 77 at 16.  The Court agrees.

4          "To determine whether counsel's errors prejudiced the outcome of the trial, we
5    must compare the evidence that actually was presented to the jury with that which could
6    have been presented had counsel acted appropriately."  *Thomas v. Chappell*, 678 F.3d
7    1086, 1102 (9th Cir. 2012) (internal quotations omitted).  "If the evidence could have
8    been admitted, we must then ask whether there was a reasonable probability that it would
9    have affected the outcome of the proceeding."  *Cannedy v. Adams*, 706 F.3d 1148, 1163
10   (9th Cir. 2013).

11         The Court concludes that evidence of Lee Jr.'s confession to Dorasita could have
12   been admitted at trial.  If Lee was available to testify at trial, he could have been asked
13   whether he committed the murders and made the confession to Dorasita.  When he denied
14   committing the murders and making the confession, as he most likely would, he could
15   have been asked about his confession to Dorasita under Federal Rule of Evidence 613(a).
16   Dorasita could have been called to testify about the confession under Rule 613(b),
17   assuming Lee Jr. was afforded an opportunity to explain or deny the statement.

18         If Lee was not available to testify, or if he properly invoked his Fifth Amendment
19   rights in response to questions about his commission of the murders or his confession,
20   Dorasita's testimony about the confession would likely be admissible as a statement
21   against interest under Rule 804(b)(3).  Admission to murder, particularly when made to a
22   law enforcement officer, clearly is a statement against interest.  In addition, the
23   corroborating circumstances required by Rule 804(b)(3)(B) likely exist in this case.  As
24   noted above, Lee Jr.'s alleged confession included accurate details of the crime (that a .30
25   caliber gun was used and the young woman was not the primary target) and facts that
26   were consistent with Lee Jr.'s situation (a drug deal gone bad, when Lee Jr. apparently
27   was involved in drug sales, and use of a weapon that Lee Jr.'s father might well have
28   obtained in connection with his illicit business).  In addition, the fact that the alleged

confession was made to a law enforcement officer, while Lee Jr. was in custody, and with no apparent benefit to himself, adds to its credibility.

With respect to the pawn shop evidence, counsel could have cross-examined SA Jones about Begay having provided him with the pawn shop receipts.  Alternatively, counsel presumably could have secured records from the pawn shop that could have been admitted under Rule 803(6) through the testimony of a records custodian.

Significantly, the government does not argue that evidence of Lee Jr.'s alleged confession or the pawn shop receipts would not have been admissible in evidence.  The government instead argues that the evidence would not have affected the outcome of the trial.  The government emphasized that two eyewitnesses connected Begay to the crime scene, their testimony was consistent, and the physical evidence at the scene (the broken glass and shell casings) corroborated their accounts of what happened.  Both witnesses also testified that they were afraid of Begay and that he urged them to implicate others in the murders.  Although Jessica Lee did not come forward until almost two years after the homicides and Clark initially lied to investigators and did not come forward until four years later, both testified that they waited until they had moved away from their small community before implicating a community member.

As noted above, Begay must show a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Clark*, 769 F.3d at 725.   A reasonable probability is one sufficient to undermine confidence in the outcome of a proceeding.  *Id.*   The likelihood of a different result must be substantial, not merely conceivable.  *Id.*

The errors of counsel in this case undermine confidence in the trial's outcome. There was no physical evidence directly connecting Begay to the murders.  The murder weapon was never recovered.  The evidence established no motive for Begay to have shot the victims.  One eyewitness did not actually see the shooting and was highly intoxicated. The other lied to the FBI before implicating Begay four years after the murders.

The Court cannot be confident that the jurors would have reached the same

1    unanimous guilty verdict had they learned that (1) another person in the community
2    confessed to the murders, (2) the confession was made to a law enforcement officer,
3    (3) the confession included facts consistent with the murder and with Lee Jr. as the
4    possible shooter, and (4) Begay had pawned the SKS rifle that Clark claimed was used in
5    the shooting.  While the Court cannot say with certainty that the result in the trial would
6    have been different, it can say that the likelihood of a different result is substantial, not
7    merely conceivable.  *Clark*, 769 F.3d at 725.  Begay has met his burden in demonstrating
8    prejudice under *Strickland*.

9    **IV.    Motion to Strike.**

10         The government has filed a motion to strike Begay's amended response to the
11   government's objections to the Supplemental R&R.  The response includes numerous
12   exhibits.  Because the Court did not consider any of the exhibits in its analysis, the
13   motion to strike is denied as moot.

14        **IT IS ORDERED:**

15        1.    The Court **accepts in part and rejects in part** the Original R&R (Doc. 8)
16              and **accepts** the Supplemental R&R (Doc. 77) in its entirety.

17        2.    Respondent's motion to strike (Doc. 87) is **denied**.

18        3.    Begay's motion to vacate (Doc. 111 in CR-06-0626 PCT DGC) is **granted**.

19        4.    The judgment in CR06-0626 PCT DGC is **vacated**.

20        5.    Begay is hereby granted a **new trial** in case number CR06-0626 PCT DGC.

21        6.    A status conference is set in case number CR06-0626 PCT DGC for
22              **April 27, 2015 at 4:00 p.m.**

23        7.    Attorney Dana Carpenter is appointed to represent Defendant for all further
24              proceedings in CR06-0626 PCT DGC

25        8.    Trial is set for **May 12, 2015 at 9:00 a.m.**

26        9.    The USMS is directed to transport the Defendant to the District Arizona for
27              further proceedings**.**

28        10.   Defendant shall remain in custody pursuant to the Order of Detention dated

1         July 6, 2006 (Doc. 8).

2     Excludable delay shall begin as of this date.

3     Dated this 31st day of March, 2015.

4

5

6                                       _____

7                                           David G. Campbell
                               United States District Judge

8

9 cc:    USMS
        Dana Carpenter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28